**EXHIBIT A**

<u>**DECLARATION OF LAURA STEINBACH IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM***</u>

I, Laura J. Steinbach, Special Agent with the Federal Bureau of Investigation ("FBI"), do hereby declare:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2014.  I am currently assigned to a squad in the Baltimore Division responsible for investigating complex financial crimes such as mail fraud, wire fraud, financial institution fraud and money laundering.  I have prepared and executed numerous probable cause warrants.  As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

<u>**PURPOSE OF THIS DECLARATION**</u>

2.    This Declaration is submitted in support of the Verified Complaint for Forfeiture *In Rem* against all USDT tokens associated with the virtual currency address "**0xa8d106387F639301f6edE90Ca7484408A34cC8cb**", herein referred to as the "**Defendant Property**".

3.    I submit that there are sufficient facts to support a reasonable belief that the **Defendant Property** constitutes proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud) and is involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering), and thus is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

## INVESTIGATION OF THE SUBJECT PROPERTY

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

4.      Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency.  The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own.  The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information.  Addresses are also used to send and receive cryptocurrency.  Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency.  A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user.  Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet.  The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions.  Secret keys are typically only shared with the owner of the address.

5.      Cryptocurrency transactions can have multiple inputs and multiple outputs.  While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency.  Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address.  As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

6.      Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money.  In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

7.      Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals.  I also know that when information is shared, it is usually among a trusted group working in concert, or is in fact not shared at all, and merely the same subject accessing the information under different identifiers.

8.      Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts.  However, with cryptocurrency, the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters often attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

9.      Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

<u>Tether</u>

10.    **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency.  For example, USDC is a stablecoin pegged to the U.S. dollar.  Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

11.    **Tether (USDT):** Tether Limited ("Tether") is a company that manages the "smart contracts" and the "treasury" (*i.e.*, the funds held in reserve) for USDT tokens (a stablecoin). In the instant case, the **Defendant Property** was seized via a seizure warrant signed by the Honorable Timothy J. Sullivan, Chief United States Magistrate Judge in the District of Maryland on October 15, 2024.

## The Investigation of the Defendant Property

12.    The FBI is investigating what is known as a cryptocurrency "tech fraud scam" with multiple victims located throughout the United States. "Tech fraud" scams take a variety of forms, but generally involve complaints from victims that state they received an email or a "pop up" message on their home computer that indicates their device has been "hacked". The "pop up" message often is accompanied by a frozen screen and provides a notice to call "Microsoft",

"Apple", or another widely known computer software company to resolve the issue. Common examples of the "pop up" messages received by victims resemble the following:




13.      Once victims contact "Microsoft" or "Apple" in an effort to rectify the "hack", they are passed through a series of imposters who purport to be affiliated with the aforementioned software companies, government institutions, and law enforcement entities. The imposters convince victims that not only are their home computing devices compromised, but their identities and personal information has also been stolen.  The fraudsters then convince victims that they must move their assets out of their current financial institutions to other financial accounts in order to "safe-guard" their funds. The victims are led to believe that the accounts they are instructed to send funds to are set-up by the United States government and will be protected. In reality, the accounts victims are directed to send the funds are controlled by co-conspirators involved in the fraud scheme and are often located overseas.  Victims are also often directed to withdraw large sums of money from their financial institutions and open virtual currency accounts to send the funds to cryptocurrency wallets controlled by co-conspirators. Once again, victims are led to

believe that the virtual wallets they are directed to send money to will be used to "safe-guard" their funds, but in reality are controlled by co-conspirators.

14.     In November 2022, the FBI received a complaint from a victim of a "tech-fraud" scam residing in Silver Spring, MD (herein referred to as "Victim 1"). According to Victim 1, Victim 1 received an email in or about October 2022 that stated her Apple account had been hacked. Victim 1 called the number on the message and spoke to an unknown female ("UF") on the phone. The UF asked Victim 1 to install an application on her iPad named "AnyDesk." Victim 1 was unable to understand what the UF was asking her to do, and the call was ultimately dropped. Victim 1 called the "Apple support" number back and was connected with an individual who identified himself as "SAMMY BRAXTON". BRAXTON provided Victim 1 with his identification number and asked Victim 1 to install the "AnyDesk" application on her iPad. BRAXTON also asked Victim 1 for the phone number on the back of her credit union debit card so that he could call the credit union and advise them of the fraud. Victim 1 provided BRAXTON with the phone number. BRAXTON then passed Victim 1 to an individual Victim 1 presumed to be with the fraud unit of her credit union. The "credit union employee" identified himself as "DANIEL CARMEN". CARMEN also provided Victim 1 with his badge number.

15.     CARMEN informed Victim 1 that he saw transactions in her checking account that appeared suspicious and told Victim 1 that her Social Security number had been compromised. CARMEN then purported to contact the Social Security Administration ("SSA") and the Federal Deposit Insurance Corporation ("FDIC") on Victim 1's behalf. CARMEN also informed Victim 1 that her bank account had been infected by a virus.

16.     After speaking with CARMEN, Victim 1 received a phone call from an individual who identified himself as "WAYNE HAGER" from the SSA. HAGER informed Victim 1 that

CARMEN contacted the SSA to report Victim 1's SSN had been compromised. HAGER also told Victim 1 that he had reviewed her information and saw that other individuals had opened accounts and credit cards in her name. In a separate conversation with CARMEN, CARMEN stated that he would start an investigation to find the hacker and would put a trace on Victim 1's SSN, wifi network, and phone. Victim 1's information would purportedly be monitored, and all of the information CARMEN collected would be shared with the FBI. HAGER told Victim 1 to keep the investigation private because the hacker's identity was unknown and the hacker could be anyone, including Victim 1's friends or family.

17.    CARMEN told Victim 1 that she needed to move funds in her financial accounts to keep the funds secure and advised Victim 1 that the FDIC set up personal accounts for Victim 1 in Hong Kong in order to secure the funds. Victim 1 received a letter purported to be from the FDIC dated August 17, 2022. The letter contained multiple formatting and grammatical errors and requested that Victim 1 contact CARMEN to guide Victim 1 through the process of safeguarding her funds. A screenshot of the letter purported to be issued by the FDIC is as follows:



550 17th Street NW,
Washington,
DC, 20429.
Date: 08/17/2022

To,

███████        We have received an email from Bank-Fund Staff FCU about getting hacked of your financial institutions. After going through email we have come to the conclusion that you need to safeguard all of your funds which are in your Bank-Fund Staff FCU and other financial institutions. FDIC will be providing an insurance of $2,000,000.00 for all of your funds.

        Bank-Fund Staff FCU Fraud prevention department representative Daniel Carmen is going to help you safeguarding your funds.

You can contact Daniel Carmen at 202-945-0820. He will be guiding you to safeguard your funds.

Regards,
FDIC
(Fraud Prevention)

(Figure 1)

18.     On February 17, 2023, your Affiant contacted a Special Agent from the FDIC's Office of Inspector General in reference to the above letter. Your Affiant learned that nobody by the name of "DANIEL CARMEN" or "PAUL WINSLEY" (as listed in the signature line of the letter) was listed in the FDIC agency directory.

19.     Victim 1 sent several wire transfers to accounts in Hong Kong at the direction of the aforementioned scammers.  One specific wire was sent on September 20, 2022, in the amount of $210,000 to account number 242845600888 in the name of "CHAN YIP TIN BENNY" located at Hang Seng Bank Limited in Hong Kong.  When Victim 1 went to the credit union to withdraw or transfer funds, employees at the credit union asked Victim 1 if she knew the individuals to

whom she was sending the funds and what her relationship was with those individuals. CARMEN directed Victim 1 to tell the credit union employees that she was sending money to her brother-in-law that was losing his business due to COVID.

20.    In addition to sending wire transfers, Victim 1 deposited funds into cryptocurrency ATMs at the direction of CARMEN. CARMEN sent QR codes to Victim 1 to use for the transactions when she went to the ATMs.[1] Victim 1 maintained receipts of the deposits she made into the cryptocurrency ATMs.

21.    As a result of CARMEN's requests for money, Victim 1 sent a total of 3.29 bitcoin (BTC)[2] over a total of nine transactions in October 2022 via cryptocurrency ATMs. The U.S. dollar value of the 3.29 BTC Victim 1 sent at the time of the transactions was approximately $76,800.

22.    Further, Victim 1 transferred a total of approximately $2,100,000 to bank accounts located in Hong Kong as a result of the fraud.

23.    Throughout the course of the investigation, the FBI has located several additional victims who appear to have been defrauded by the same group of perpetrators directing the "tech-fraud" scam that was responsible for defrauding Victim 1. On December 2, 2022, November 5, 2023, and November 11, 2023, Victim 2, who resides in Wells, Vermont, submitted three online complaints to the FBI regarding a "tech fraud" scam. According to Victim 2, Victim 2's wife was on the computer when a "pop-up" from "Microsoft" appeared with a "blaring" noise. Victim 2 called the number listed on the pop-up and spoke with an individual who identified herself as "JULIAN" or "JULIA". JULIAN/JULIA informed Victim 2 that his IP

---

[1] Customers can scan QR codes when conducting transactions at cryptocurrency ATMs to provide the addresses where virtual currency will be sent in the transactions.
[2] Unless indicated otherwise, all virtual currency amounts in this affidavit have been rounded to the nearest 0.01.

address was compromised and that he should contact his bank. Victim 2 looked up the phone number for the bank on his computer, called, and spoke with an individual purported to be with the bank's fraud department named "DAVID WHITE". Similar to Victim 1, WHITE instructed Victim 2 to download the "AnyDesk" software so that he could assist Victim 2. While connected remotely, WHITE asked Victim 2 to log into his bank account and to share his screen with WHITE.  WHITE informed Victim 2 that a software called "Spy Eye" was installed on his computer that allowed hackers to remove money from bank accounts, but the transfers would not be visible to Victim 2 as an end user. WHITE told Victim 2 that hackers had already removed $109,000 from his bank account and the rest of Victim 2's funds needed to be moved to offshore and cryptocurrency accounts in order to keep the money safe.  As a result, Victim 2 sent several wire transfers to bank accounts in Hong Kong between September 27, 2022, and November 14, 2022, at the direction of WHITE.  One such transfer occurred on September 28, 2022, when Victim 2 sent a wire transfer of $179,000 to account number 242845600888 in the name of "CHAN YIP TIN BENNY" located at Hang Seng Bank Limited. This is the same bank account Victim 1 sent a wire transfer of $210,000 to just days before on September 20, 2022. WHITE told Victim 2 to tell employees at the bank that he was investing in property in Hong Kong if questioned about the nature of the wires and warned Victim 2 that the bank employees could not be trusted.

24.     In addition to sending wire transfers, Victim 2 was directed to open a cryptocurrency account with Coinbase, but was unable to do so on his own. Victim 2 contacted what he believed to be Coinbase support and spoke with an individual who identified himself as

a "JOHN PARKER". PARKER assisted Victim 2 with opening a Coinbase account. Victim 2

sent PARKER a picture of himself and his license to open the Coinbase account.

25.    Between approximately December 7, 2022, and April 5, 2023, Victim 2 sent a

total of approximately $109,000 from his bank accounts at M&T Bank and Citizens Bank to

Victim 2's Coinbase account, where it was used to purchase the cryptocurrencies bitcoin, ether,

and USDT. In March 2023, PARKER informed Victim 2 that his funds were invested in bitcoin

and that the value of bitcoin had grown since his initial investment. PARKER informed Victim 2

that since his investment had grown so large, Victim 2 was required to make a payment of

$275,000 to cover the taxes on bitcoin's growth.  As a result, Victim 2 took out a home equity

loan for $225,000 and a personal loan for $50,000 in order to pay the "taxes". In the summer of

2023, Victim 2 requested a return of his funds. At that point, PARKER's "supervisor," who

identified himself as "JUSTIN", took over for PARKER and began to communicate with Victim

2. Victim 2 spoke with JUSTIN every day for weeks about obtaining his funds, but

communication stopped after Victim 2 informed JUSTIN that he filed a complaint with

Coinbase.

26.    In addition to sending wire transfers and investing in cryptocurrency, Victim 2

purchased approximately $5,000 in gift cards at the direction of the fraudsters and provided the

gift card numbers to those individuals. Victim 2 was told that the gift cards were meant to

purchase software that would facilitate "clearing up the hack".

27.    In total, Victim 2 sent approximately $1,379,000 in wire transfers to accounts in

Hong Kong and approximately $109,000 to Coinbase as a result of the fraud. Funds located in

Victim 2's Coinbase account were traced to the **Defendant Property** using a commercially

available proprietary software tool that analyzes transactions on cryptocurrency blockchains.

Records obtained from Coinbase showed that the approximately $109,000 Victim 2 sent from Victim 2's bank accounts to Coinbase went to an account in Victim 2's name at Coinbase. Those funds were primarily used to purchase USDT, the majority of which was ultimately sent to the **Defendant Property** via the transactions shown in the following table:

| DATE | AMOUNT (USDT) | SOURCE | DESTINATION |
|------|------|------|------|
| 01/11/2023 | 18,799.65 | Victim 2 (Coinbase) | 0xA57c755893f32B3C568A543bbd13F640F97FE4FD ("**Address 1**") |
| 01/17/2023 | 9,809.47 | Victim 2 (Coinbase) | **Address 1** |
| 01/17/2023 | 29,339.39 | Victim 2 (Coinbase) | **Address 1** |
| 01/18/2023 | 47,659.31 | Victim 2 (Coinbase) | **Address 1** |
| 03/01/2023 | 95,607.82 | **Address 1**[3] | **Defendant Property** |

28.     Following the identification of the **Defendant Property** as holding illicit proceeds, a cryptocurrency tracing analysis was conducted to identify the source of all funds located in the **Defendant Property** beyond those traceable to Victim 2. The funds were traced to the cryptocurrency companies Coinbase and Athena Bitcoin. Your Declarant obtained records from Coinbase and Athena Bitcoin, which led to the identification of multiple individuals whose funds

---

[3] Victim 2's Coinbase account was the only source of USDT for **Address 1**. Deposits made to **Address 1** from Victim 2 totaled 105,607.82. However, only 95,607.82 was traced to the **Defendant Property.** The 10,000.00 USDT received by **Address 1** that was not sent to the **Defendant Property** was traced to a cryptocurrency exchange based in Hong Kong.

were sent to the **Defendant Property** in addition to Victim 2. Several of the individuals were interviewed and determined to be victims of fraud similar to Victims 1 and 2.

29.     Victim 3, who resides in Covington, Louisiana, was identified as a victim whose funds were removed from her account without her consent and sent to the **Defendant Property**. On March 5, 2024, Victim 3 attempted to contact Coinbase to determine why she had a purchase limit on bitcoin. Victim 3 contacted a phone number she found online through searching "Coinbase". Victim 3 spoke with a male who she believed was employed by Coinbase and identified himself as "JOHN PARKER", the same name provided to Victim 2.

30.     PARKER informed Victim 3 that there was "suspicious activity" on her account and that Victim 3 was currently being hacked. PARKER requested access to Victim 3's personal computer (PC), which Victim 3 provided. PARKER also requested Victim 3's Apple ID and associated password for her Apple iPhone.

31.     While accessing Victim 3's PC, PARKER blacked out her screen so she could not see anything he was doing. Victim 3 expressed uncertainty with what PARKER was doing, at which time PARKER revealed the PC screen to Victim 3. Victim 3 did not see anything out of the ordinary when she was able to see her screen.

32.     During the period in which PARKER was accessing Victim 3's PC, Victim 3 received emails from Coinbase alerting her to transactions occurring in her account. Victim 3 did not see these emails as they went into her email trash folder and believes PARKER kept her on the phone to prevent her from receiving these notifications.

33.     PARKER instructed Victim 3 not to speak with anyone, tell anyone what was happening with her computer, or who she was speaking to on the phone. Victim 3 became suspicious she was the victim of a scam and wanted to end the call with PARKER, but remained

on the call fearing he would continue to access her accounts anyway. While on the phone with PARKER, Victim 3 went to her neighbor's house and wrote a note to her neighbor that she believed she was being scammed. Victim 3's neighbor searched the number for Coinbase and found a different number than the number Victim 3 had contacted. Victim 3 asked her neighbor to call the legitimate number for Coinbase, however the neighbor's phone was unable to complete the call. At that time, Victim 3's fiancé arrived at the residence and contacted the legitimate Coinbase number from his phone.

34.    Victim 3 provided two verification codes to PARKER which were sent to her phone in order to access her accounts, but did not want to provide the third as she was trying to prevent PARKER from further accessing her accounts. PARKER became hostile towards Victim 3, accusing her multiple times of speaking to someone. PARKER then ended the phone call with Victim 3.

35.    After ending the phone call with PARKER, Victim 3 learned PARKER initiated three bitcoin transfers all occurring on March 5, 2024. According to Victim 3, the first transaction amounted to $98,106.44, the second transaction amounted to $135,617.28, and the third transaction amounted to $9,860.15, totaling $243,583.87. Victim 3 believed PARKER had to liquidate various other cryptocurrency mediums in Victim 3's Coinbase wallet in order to purchase bitcoin and transfer the funds out in bitcoin.

36.    Victim 3 attempted to contact the number she originally found in her search for "Coinbase," but it had already been disconnected. PARKER has not contacted Victim 3 since this incident.

37.    The bitcoin transferred out of Victim 3's Coinbase account by PARKER was traced to the **Defendant Property** using a commercially available proprietary software tool that

analyzes transactions on cryptocurrency blockchains. Records obtained from Coinbase showed that the bitcoin transferred out of Victim 3's account by PARKER over three transfers went to a single address (**Address 2** as defined in the table below). All of the bitcoin from Victim 3's Coinbase account was then sent in a single transaction from **Address 2** to a Bitcoin wallet ("**Wallet A**") identified by the software that contains 12 addresses. This activity is shown in the following table:

| DATE | AMOUNT (BTC) | SOURCE | DESTINATION |
|---|---|---|---|
| 03/05/2024 | 1.54 | Victim 3 (Coinbase) | bc1qntad3sr8yatpc7np7lg2zsjvd554na3vkzh0nl ("**Address 2**") |
| 03/05/2024 | 2.15 | Victim 3 (Coinbase) | **Address 2** |
| 03/05/2024 | 0.16 | Victim 3 (Coinbase) | **Address 2** |
| 03/06/2024 | 3.84[4] | **Address 2** | **Wallet A** |

38.     Per records obtained from SafePal, a cryptocurrency wallet provider, **Wallet A** used a cryptocurrency swap feature offered by SafePal's wallets to convert all of the bitcoin from Victim 3's Coinbase account to USDT (for a total of 260,872.05 USDT)[5] and send it to the **Defendant Property** via the transactions shown in the following table below:

| DATE | AMOUNT (USDT) | SOURCE | DESTINATION |
|---|---|---|---|
| 03/06/2024 | 29,957.07 | **Wallet A** | **Defendant Property** |
| 03/06/2024 | 30,132.72 | **Wallet A** | **Defendant Property** |

---

[4] The sum of the BTC sent to **Address 2** from Victim 3's Coinbase account does not equal the 3.84 BTC sent from **Address 2** to **Wallet A** due to rounding.

[5] The value of bitcoin increased during the timeframe between the withdraw of bitcoin from Victim 2's Coinbase account and the conversion of bitcoin to USDT, which accounts for the increase in the amount of USDT.

| 03/06/2024 | 30,117.61 | **Wallet A** | **Defendant Property** |
|---|---|---|---|
| 03/06/2024 | 29,583.17 | **Wallet A** | **Defendant Property** |
| 03/06/2024 | 29,940.07 | **Wallet A** | **Defendant Property** |
| 03/06/2024 | 29,978.98 | **Wallet A** | **Defendant Property** |
| 03/06/2024 | 29,036.02 | **Wallet A** | **Defendant Property** |
| 03/06/2024 | 30,178.07 | **Wallet A** | **Defendant Property** |
| 03/11/2024 | 21,948.34 | **Wallet A** | **Defendant Property** |

39.    Victim 4, who resides in Norman, OK, was identified as another victim whose funds were sent to the **Defendant Property**. On April 2, 2024, Victim 4 attempted to transfer the cash held in his Coinbase account to his external bank account, but was unable to do so. Victim 4 contacted Coinbase from the number listed on the Coinbase website to resolve the issue, but was unable to speak to anyone. Victim 4 then contacted an unknown Oklahoma number he found online by searching "Coinbase Support".

40.    Victim 4 spoke with a male who identified himself as "JOHN PARKER", the same name provided by Victim 2 and Victim 3. PARKER instructed Victim 4 to download several applications on his PC, including "UltraViewer," "AnyDesk," and "RemotePC." In accessing Victim 4's PC through one of the applications, PARKER blacked out Victim 4's screen so he could not see anything PARKER was doing, similar to Victim 3's reported experience. According to Victim 4, PARKER was able to log into Victim 4's Coinbase account on Victim 4's PC. PARKER informed Victim 4 that his account had been hacked by someone in Los Angeles and PARKER needed to review Victim 4's Coinbase transaction history. PARKER downloaded a Coinbase

transaction history document for Victim 4's account. PARKER then informed Victim 4 he would need to transfer Victim 4's cryptocurrency into another wallet in order to prevent the hacker from accessing Victim 4's funds.

41.     PARKER noticed transactions from Victim 4's Coinbase account to Victim 4's account at Uphold, a cryptocurrency storage company, in Victim 4's Coinbase transaction history report. PARKER became very adamant he needed to obtain the cold storage ledger from Victim 4. Victim 4 was unable to access his Uphold account and needed to reset the password to do so. PARKER instructed Victim 4 to download an unknown application onto Victim 4's Apple iPhone to assist Victim 4 in resetting his password. PARKER also wanted access to Victim 4's cellular phone to help Victim 4 take a picture of his driver's license for verification purposes. PARKER refused to allow Victim 4 to end the call, creating a sense of urgency with Victim 4 and stated he would be fired if Victim 4 did not allow PARKER to finish helping him. At this time, Victim 4 became suspicious of PARKER and ended the telephone call. PARKER called Victim 4 back and left a voicemail.

42.     According to Victim 4, PARKER purchased $4,035.00 of bitcoin from the cash available in Victim 4's account and then transferred approximately $23,000.00 in various cryptocurrencies out of Victim 4's Coinbase account. Victim 4 later found emails from Coinbase alerting him to the access of his account and transactions performed in the account in his email spam folder.

43.     The bitcoin transferred out of Victim 4's Coinbase account by PARKER was traced to the **Defendant Property** using a commercially available proprietary software tool that analyzes transactions on cryptocurrency blockchains. Records obtained from Coinbase showed that the bitcoin transferred out of Victim 4's account by PARKER over two transfers went to a

single address (**Address 3** as defined in the table below). Victim 4's bitcoin was then sent from **Address 3** to THORChain. THORChain is a network that allows cryptocurrency users to swap between different cryptocurrencies, including bitcoin and USDT. According to an open source blockchain explorer for THORChain, Victim 4's bitcoin was swapped for USDT using THORChain and sent to an Ethereum address (**Address 4** as defined in the table below). The USDT was then sent from **Address 4** to the **Defendant Property**. This activity is shown in the following table:

| DATE | AMOUNT | SOURCE | DESTINATION |
|------|--------|--------|-------------|
| 04/02/2024 | 0.24 BTC | Victim 4 (Coinbase) | bc1qclagvgvg0aduwdd8jqkas6dwmkkqmesysehrm6 ("**Address 3**") |
| 04/02/2024 | 0.13 BTC | Victim 4 (Coinbase) | **Address 3** |
| 04/02/2024 | 0.36[6] BTC | **Address 3** | THORChain |
| 04/02/2024 | 23,345.94 USDT | THORChain | 0x422eFFDa4e28FeE3624F1C7f34B6B212e5C6cFE2 ("**Address 4**") |
| 04/03/2024 | 24,492.29[7] USDT | **Address 4**[8] | **Defendant Property** |

44.    Several additional victims were identified whose stolen funds were sent to the **Defendant Property** in addition to Victims 2, 3, and 4. The funds sent to the **Defendant Property** from these victims were traced to the **Defendant Property** in the same fashion as Victims 2, 3,

---

[6] The sum of the 0.24 BTC and 0.13 BTC sent to **Address 3** from Victim 4's Coinbase account does not equal the 0.36 BTC sent from Address 3 to THORChain due to a small amount of Victim 4's BTC being sent back to **Address 3** as part of the same transaction.
[7] This transaction included a small amount of USDT held by **Address 4** from a source other than Victim 4.
[8] No USDT was sent out of **Address 4** between the receipt of the 23,345.94 USDT on 04/02/2024 and the sending of 24,492.29 USDT to the **Defendant Property** on 04/03/2024.

and 4.   A list of the additional victims whose stolen funds were sent to the **Defendant Property** are listed in Exhibit 1 as an attachment to this Declaration.

45.    In light of the foregoing, and based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial accounts, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The above blockchain analysis demonstrates this; it shows the movement of the victims' funds, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership, and control of the illicit proceeds. See, e.g., *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

46.    Based on the specific tracing of USDT obtained fraudulently from Victims 2-10 to the **Defendant Property**, it is reasonable to believe that the funds in the **Defendant Property** are proceeds of criminal activity.

47.    On April 11, 2024, Tether voluntarily agreed to freeze the **Defendant Property** at the request of your Affiant after being provided a list of transaction hashes associated with the fraud scheme. As of April 11, 2024, the **Defendant Property** had a balance of 732,196.97 USDT

after receiving a total of 802,472.00 USDT and sending out a total of 70,275.02 USDT since its first transaction on March 1, 2023.[9]

48.     On October 15, 2024, the **Defendant Property** was seized via a seizure warrant signed by the Honorable Timothy J. Sullivan, Chief United States Magistrate Judge in the District of Maryland.

## **CONCLUSION**

49.     Based on the forgoing, I submit that there is probable cause to believe that all funds held in the **Defendant Property**, in any form, are proceeds of, or traceable to proceeds of violations of 18 U.S.C. §1343 (Wire Fraud), and are involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering), and therefore subject to civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

_Laura J. Steinbach_

_____
Special Agent Laura Steinbach
Federal Bureau of Investigation

---

[9] The USDT balance in the **Defendant Property** does not equal the total USDT received less the total USDT sent out due to rounding.

**EXHIBIT 1**

**ADDITIONAL VICTIM FUNDS TRACED TO THE DEFENDANT PROPERTY**

| VICTIM | SOURCE OF FUNDS | DATE(S)[10] | TOTAL AMOUNT (USDT)[11] |
|---|---|---|---|
| Victim 5 | Coinbase | 04/27/2023, 05/03/2023, 05/06/2023 | 31,196.01 |
| Victim 6 | Athena Bitcoin | 09/13, 09/20, & 09/29/2023, 11/03/2023, 11/07/2023 | 94,051.89 |
| Victim 7 | Coinbase | 10/30/2023 | 6,427.11 |
| Victim 8 | Athena Bitcoin | 01/09/2024 | 23,052.12 |
| Victim 9 | Athena Bitcoin | 02/03/2024 | 32,585.27 |
| Victim 10 | Coinbase | 02/29/2024 | 29,631.52[12] |

---

[10] The dates in this column represent the dates of the transactions where USDT traceable to each victim was sent to the **Defendant Property**.

[11] Except where otherwise noted, the amounts in this column represent the total amount of USDT traceable to each victim that was sent to the **Defendant Property** over one or more transactions.

[12] The amount attributable to Victim 10 from this total was approximately 4,000 USDT. Victim 10's funds were commingled with funds from other possible victims the FBI has attempted to contact without success.